**Affirmed and Opinion filed May 22, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-16-00799-CR

**DARRELL WAYNE LOGE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 263rd District Court
Harris County, Texas
Trial Court Cause No. 1407028**

**O P I N I O N**

Appellant Darrell Wayne Loge appeals his conviction for attempted sexual assault. Appellant contends on appeal that (1) the evidence is legally insufficient to support his conviction; (2) the trial court committed fundamental error during voir dire by making allegedly improper comments to the venire panel; and (3) the trial court erred by failing to include an extraneous offense instruction in the punishment phase jury charge. We affirm.

## BACKGROUND

Appellant was indicted for attempted sexual assault. He was released from custody on a $30,000 bond. A jury trial was held from September 23, 2016, until September 27, 2016. Appellant was present during the voir dire portion of trial. He failed to appear for any other part of trial, including the guilt-innocence and punishment phases of trial.

The complainant testified at trial that she, her husband, and their two children were on their way to purchase a vehicle on September 3, 2013, when they stopped at a gas station so complainant could use the restroom. Complainant's husband and children waited in the car while she went into the gas station's ladies' restroom. As complainant was washing her hands, she saw in the mirror that appellant came out of one of the stalls. She got scared and tried to leave the restroom, but appellant "grabbed [her] so hard" from behind that she could not move.

Appellant locked the restroom door, grabbed her neck, choked her with one hand, and covered her mouth with his other hand. Appellant said something to complainant but she did not understand him because she does not understand or speak English. Appellant started choking her with both hands. Complainant testified that she was in "horrible pain," could not breathe, and was "making some really ugly noises . . . sort of coughing" as she was trying to get air.

Complainant testified that she tried to "do something with [her] hands" and also tried to kick backwards at appellant but she was unable to do so because appellant was "completely on top of [her] and [she] couldn't do anything to him." Complainant started losing her strength. As her body went limp, appellant moved her toward his genitals. She saw that appellant "had his pants down because [she] saw his leg." Complainant testified that this was her "opportunity to harm him" so she scratched him and "tried to get up toward him to fight" him. In the process, she

2

touched something wet she believed was appellant's penis, but she could not see it because appellant was wearing a long shirt.

Complainant got up from the floor to fight with appellant. During the fight, complainant "ended up in front of him" and was able to see part of appellant's face and his right eye. In her attempt to fight appellant so he would let go of her, complainant put her hand in appellant's mouth. Appellant bit complainant's hand, leaving a wound. Complainant testified that they continued to struggle and appellant turned her back around and they fell on the floor. Complainant continued to struggle with appellant on the restroom floor. Appellant covered complainant's mouth and "tried to pull down" her pants but she kept moving and appellant was unable to take off her pants. She then screamed as loudly as she could six or seven times "Help me" until she no longer felt appellant and "[h]e stood up from [her]."

When appellant got up, he went back into the stall. Complainant got up from the floor, unlocked the restroom door, left the restroom, and walked down the hallway back into the gas station. Complainant screamed for help and approached the cashier. Complainant told the cashier to call the police because a man had tried to kill and rape her in the ladies' restroom. Complainant then saw appellant coming out of the restroom hallway. "He had a cap on and he was coming out, but looking a different direction." Complainant screamed, "Take him" as appellant was walking towards the gas station exit, but no one stopped him.

After appellant exited the gas station, complainant went outside to her husband and told her husband what had happened. Complainant's husband called the police. When the police arrived, they interviewed complainant and took pictures of the red marks on her neck and the teeth marks on her hand.

The gas station cashier, Elizabeth Martinez, testified at trial. She stated that she was ringing up a customer on September 3, 2013, when complainant "just came

3

screaming, holding her neck" from the restroom. Complainant spoke to Martinez in Spanish telling her that a "guy tried to choke her and tried to rape her in the restroom." Complainant also said "Ayudame" which Martinez testified meant "Help me." Martinez testified that complainant pointed to appellant as the man who attacked her in the restroom and tried to rape her. When complainant pointed to appellant saying, "it's him," appellant was right behind her "all red." Appellant was "fixing his shirt and fixing his pants;" he looked scared. He was nervous and said, "She's crazy. She's crazy. She don't know what she's talking about. . . . Don't listen to her." He then walked out of the gas station and went to his truck.

Martinez testified that she recognized appellant as the man complainant pointed out as her attacker on the gas station surveillance video; he was wearing a blue shirt, khaki pants, and a hat. Martinez identified appellant as the man complainant claimed was her attacker on still frames taken from surveillance footage shown by the State in court. Martinez also identified appellant as the man complainant claimed was her attacker on another photo the State showed Martinez in court. Martinez confirmed that complainant had visible red marks on her neck and was hysterical and crying.

Houston Police Officer Sol Thomas, who was assigned to investigate the case, testified at trial. She stated that she obtained surveillance footage from the gas station. Officer Thomas reviewed the surveillance footage, spoke to complainant and other witnesses in the case, and conducted further investigation which enabled her to locate appellant. She showed complainant a photo array consisting of six photos. Complainant identified appellant and another male in the array as her attacker. Officer Thomas then obtained a warrant for appellant's arrest, who was in Harlingen, Texas at the time. Officer Thomas identified appellant in court on a still frame photo taken from surveillance footage. Officer Thomas also identified

4

appellant based on his booking photo.

Harlingen Police Department Investigator Manuel Tovar testified at trial that he assisted in appellant's arrest at the Harlingen Police Department. Investigator Tovar identified appellant on a photo the State showed him at trial as the person he booked in Harlingen. Investigator Tovar testified that he let appellant make a call on appellant's cell phone after appellant could not reach anyone using the landline at the police station. Investigator Tovar was present when appellant first called his sister-in-law Stacy, who did not answer appellant's calls. Appellant then called his pastor, and Investigator Tovar heard appellant say, "Pastor, do you remember what we were talking about? They're arresting me now for that."

While appellant was talking to his pastor, Stacy called appellant back on his cell phone. Appellant placed the pastor on hold and spoke to Stacy. According to Investigator Tovar, appellant said, "Stacy, I need you to bail me out. . . . Look, if you can bail me out, I'll pay you later. . . . Look, it was just a misunderstanding. It was an accident. It was a misunderstanding. I was in — I made a mistake by going into the women's restroom. . . . I was in the women's restroom and I tried to get out, but this woman was holding me by my leg and she wouldn't let me go."

The jury found appellant guilty of attempted sexual assault and assessed appellant's punishment at 10 years' confinement and a $10,000 fine. On October 28, 2016, the trial court pronounced the sentence in open court in appellant's presence. Appellant filed a timely notice of appeal.

## ANALYSIS

### I. Sufficiency of the Evidence

We begin by addressing appellant's legal sufficiency challenge in his third

5

issue. Appellant argues that the evidence is legally insufficient to support his conviction for attempted sexual assault because (1) complainant never testified that appellant "'put' her on the ground as alleged in the indictment;" (2) "the evidence is insufficient to support that Appellant committed acts of more than mere preparation that tended to but failed to effect the commission of sexual assault," and had the specific intent to commit a sexual assault; and (3) various statements appellant made after the alleged attempted sexual assault do not support the jury's verdict.

When reviewing the legal sufficiency of the evidence, we consider the combined and cumulative force of all admitted evidence and any reasonable inferences therefrom in the light most favorable to the verdict to determine whether a jury was rationally justified in its verdict. *Johnson v. State*, 509 S.W.3d 320, 322 (Tex. Crim. App. 2017). The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence, and we draw all reasonable inferences from the evidence in favor of the verdict. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

In conducting a sufficiency review, we do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). The jury may credit the testimony of the witnesses it chooses to believe, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *Id*.

"A criminal conviction may be based upon circumstantial evidence." *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). Circumstantial evidence is as probative as direct evidence and may alone be sufficient to establish guilt. *Id*.; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). It is not necessary

that every fact and circumstance point directly and independently to the defendant's guilt; it is enough that the combined and cumulative force of all the incriminating circumstances supports the jury's conclusion. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The jury may not draw conclusions based on speculation, but may draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Id.* at 15. An inference is a conclusion reached by considering other facts and deducing a logical consequence from them, while speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013).

Appellant was charged with attempted sexual assault, and the indictment alleged that appellant on or about September 3, 2013 "did then and there . . . with the specific intent to commit the offense of SEXUAL ASSAULT of [COMPLAINANT] . . . do an act, to-wit: GRABBING THE COMPLAINANT AND PUTTING HER ON THE GROUND, which amounted to more than mere preparation that tended to but failed to effect the commission of the offense intended."

A person commits sexual assault if he intentionally or knowingly causes (1) the penetration of the anus or sexual organ of another person by any means, without that person's consent; (B) the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or (3) causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor. *See* Tex. Penal Code Ann. § 22.011(a)(1) (Vernon Supp. 2017). A person commits the offense of attempted sexual assault if, with the specific intent to commit sexual assault, he commits an act amounting to more than mere preparation that tends, but fails, to

7

effect the commission of sexual assault. *See id*. § 15.01(a) (Vernon 2011).

Appellant contends that the evidence is legally insufficient to support his conviction because complainant never testified that appellant "'put' her on the ground as alleged in the indictment." Appellant contends that complainant only testified that she and appellant "fell" to the ground during their struggle but that the words "put" and "fell" have different meanings and complainant's testimony thus cannot support the jury's verdict. According to appellant, the word "put" indicates that a person intended to place something in a certain place or move something in a specified direction, and "'fall' means to descend freely by the force of gravity."

We reject appellant's contention because the complainant's testimony reasonably supports the jury's determination that appellant committed the acts alleged in the indictment. Complainant testified that she was washing her hands when appellant exited one of the restroom stalls, grabbed her from behind, choked her with one hand, and covered her mouth with his other hand. Appellant then choked her and squeezed her throat with both hands. Complainant testified that she tried to defend herself by kicking appellant and doing "something with [her] hands" but appellant was "completely on top of [her] and [she] couldn't do anything to him."

Complainant testified that, when appellant was "choking me like this and I tried to fight and I moved my feet and I didn't feel anything, I felt that I lost my strength, that's when he put me down by his parts." She also stated that, when her body went limp and her "strength went away," appellant "took [her] towards his private parts. And I saw that he had his pants down because I saw his leg, he had a long shirt on. And that was my opportunity to harm him so I saw his leg and I scratched him and I tried to get up toward him to fight." Complainant got up to fight off appellant. She testified that they continued to struggle and appellant turned her back around and they fell on the floor.

8

We conclude that, based on complainant's testimony viewed in the light most favorable to the verdict, the jury reasonably could have determined that appellant grabbed complainant and then pushed or "put" her down on the ground as was alleged in the indictment.[1]

Next, we address appellant's contention that "the evidence is insufficient to support that Appellant committed acts of more than mere preparation that tended to but failed to effect the commission of sexual assault," and that appellant had the specific intent to commit a sexual assault.

To be guilty of an attempted offense, the defendant need not have accomplished every act short of actual commission. *Hackbarth v. State*, 617 S.W.2d 944, 946 (Tex. Crim. App. [Panel Op.] 1981). Further, "[t]he element 'with specific intent to commit an offense' has traditionally been interpreted to mean that the actor must have the intent to bring about the desired result." *Nava v. State*, 415 S.W.3d 289, 299 n.22 (Tex. Crim. App. 2013) (quoting *Flanagan v. State*, 675 S.W.2d 734, 741 (Tex. Crim. App. [Panel Op.] 1982) (op. on reh'g)). "'[P]roof of a culpable mental state generally relies on circumstantial evidence.'" *Kelley v. State*, 429 S.W.3d 865, 872 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (quoting *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978)); *Varnes v. State*, 63 S.W.3d 824, 833 (Tex. App.—Houston [14th Dist.] 2001, no pet.). Intent may be inferred from circumstantial evidence such as acts, words, and the conduct of a defendant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

---

[1] We also note that the State argued the following in closing: "There isn't even a question about whether Darrel Loge grabbed the complainant and pulled her to the ground. That's not disputed, everyone agrees that that occurred." In response to the State's argument, appellant's trial counsel acknowledged that complainant testified that appellant had grabbed her and put her on the ground when he stated: "Excuse me, that's incorrect. That's not anything — that's not what everybody testified to; only [complainant] testified to that, Judge."

9

Appellant argues that "there is no direct evidence that [he] attempted to sexual[ly] assault" complainant because (1) she never testified that he attempted to penetrate or contact her sexual organ, anus, or mouth; (2) his penis was never exposed; (3) complainant "did not observe any items such as a condom that would indicate his intent to sexual[ly] assault her;" (4) "no words were said by Appellant that indicated his intent to sexually assault her;" (5) when complainant allegedly was fighting off appellant and touched something wet she believed was his penis, "this was done at her direction, not at his;" (6) complainant "initially believed" appellant was there to rob her; (7) appellant did not "remove her pants, rip them, unbutton them, unzip them, or anything else that indicates he was actually trying to remove them;" (8) complainant's "testimony described a physical altercation, from which she sustained injuries," and not an attempted sexual assault when appellant "never touched her breasts, vaginal area, buttocks, or anus" during the altercation; and (9) during complainant's exam with the forensic nurse examiner, complainant "denied being sexually assaulted, and did not mention that [appellant] attempted to sexually assault her."

Contrary to appellant's assertion, a jury reasonably could conclude that appellant's actions demonstrated an intent to sexually assault complainant and that he "committed acts of more than mere preparation that tended to but failed to effect the commission of sexual assault."

Appellant was hiding in one of the stalls in the ladies' restroom when complainant came to the restroom. He exited the stall and attacked complainant from behind while she was occupied with washing her hands. Appellant grabbed her forcefully from behind, started choking her with one hand, and covered her mouth with his other hand so complainant could not scream. Complainant tried to fight appellant off as he started choking her with both hands but he was "completely

10

on top of [her] and [she] couldn't do anything to him." As complainant started losing her strength, appellant moved her towards his genitals. Appellant's pants and underwear already were pulled down and complainant could see his leg but was unable to see his penis because he was wearing a long shirt.

Complainant took this "opportunity to harm" appellant by scratching his leg and then getting up to fight him off. In the process, complainant touched something wet she believed was his penis. Complainant continued to fight with appellant. In the struggle, appellant "turned [her] back around and [they] fell down." Appellant was on top of her and tried to remove her pants. Appellant covered complainant's mouth and "tried to pull down" her pants but she kept moving, and appellant was unable to remove her pants. Complainant testified that she screamed for help as loudly as she could multiple times because appellant "was choking her and he wanted to rape" her. She testified that appellant "stood up from [her]" and went back into the restroom stall, after he could not remove her pants and she kept screaming for help.

Complainant testified several times that appellant tried to rape her. Contrary to appellant's assertion, complainant did not "initially believe" appellant was there to rob her. She testified: "I didn't think he was going to rob me. I wanted him to rob me, that's why I said to him, I just have my cell phone." Also, there is no evidence to support appellant's contention that "no words were said by Appellant that indicated his intent to sexually assault her." Complainant testified that appellant said something to her but she did not understand him because she does not understand or speak English well. Thus, appellant may have told complainant of his intention to sexually assault her and she was unable to understand him. In any event, appellant's intent need not be expressed by words; intent can be inferred from appellant's acts and conduct. *See Guevara*, 152 S.W.3d at 50.

11

Also without merit is appellant's argument that there is no evidence of an attempted sexual assault because complainant "denied being sexually assaulted, and did not mention that [appellant] attempted to sexually assault her" during her exam with the forensic nurse examiner. Complainant "denied being sexually assaulted" because appellant did not succeed in sexually assaulting her. Appellant was not charged with sexual assault, so it is inconsequential that complainant stated she was not sexually assaulted. Appellant acknowledges in his brief that complainant told the nurse examiner that appellant "wanted to choke me or kill me to do what he wanted," and this statement "could be viewed as a possible allusion to an attempted sexual assault."

Further, appellant's claim that she touched his penis "at her direction, not at his" ignores the fact that complainant inadvertently touched what she believed was his penis as she scratched appellant's leg and attempted to fight him off. Finally, appellant incorrectly claims that there is no evidence of an attempted assault because complainant did not testify he attempted to penetrate her sexual organ, anus, or mouth; complainant did not see a condom or other items indicating appellant's intent to sexually assault her; and appellant did not remove or rip complainant's pants and "never touched her breasts, vaginal area, buttocks, or anus." As the Court of Criminal Appeals has stated, "[T]he attempt statute does not require that every act short of actual commission be accomplished in order for one to be convicted of an attempted offense. . . . The fact that appellant could have taken further actions, without actually committing the offense of rape, does not act so as to render his actions nothing more than mere preparation." *Hackbarth*, 617 S.W.2d at 946.

Here, the evidence is legally sufficient to support a finding that appellant had specific intent to commit a sexual assault, and that appellant "committed acts of more than mere preparation that tended to but failed to effect the commission of sexual

assault." *See id.* 945-46 (evidence was legally sufficient to support a conviction for attempted sexual assault when the defendant grabbed the complainant, "started 'ripping at' the shirt she was wearing," "attempted to 'undo' the complainant's pants;" the complainant noticed the defendant's penis "was sticking out of his unzipped pants;" and after the complainant bit defendant's finger, he "released the complainant and he drove away in a car"); *Ford v. State*, 632 S.W.2d 151, 152-53 (Tex. Crim. App. [Panel Op.] 1982) (evidence was legally sufficient to prove defendant's "intent to commit rape" when complainant "saw appellant, completely nude, coming out of her sister's bedroom;" appellant knocked complainant's sister to the floor and "went after" complainant; and "appellant pushed [complainant] onto the divan and threw himself on top of her").

We also reject appellant's reliance on "[v]arious alleged statements" that "do not support the jury's verdict of attempted sexual assault." Appellant states that cashier Martinez testified that, when complainant pointed him out as her attacker, appellant said: "She's crazy. She don't [sic] know what she's talking about," and appellant was "all red" and "appeared embarrassed, scared, and nervous." Appellant also points to Investigator Tovar's testimony that appellant made the following statements to his pastor and sister-in-law in Investigator Tovar's presence: "Pastor, do you remember what we were talking about? They're arresting me now for that;" and "Stacy, I need you to bail me out . . . . Look, it was just a misunderstanding. It was an accident. It was a misunderstanding. I was in — I made a mistake by going into the women's restroom. . . . I was in the women's restroom and I tried to get out, but this woman was holding me by my leg and she wouldn't let me go."

The jury is the sole judge of credibility and weight to be given to the evidence presented at trial. *See Temple*, 390 S.W.3d at 360. The jury may disbelieve any or all of the evidence proffered and weigh the evidence as it sees fit. *Young*, 358

S.W.3d at 801.  We defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence, and we draw all reasonable inferences from the evidence in favor of the verdict.  *See Isassi*, 330 S.W.3d at 638.

Viewing the evidence in the light most favorable to the verdict, we conclude that there is legally sufficient evidence to support appellant's conviction for attempted sexual assault, and the jury was rationally justified in its verdict. Accordingly, we overrule appellant's third issue.

## II.    Voir Dire

Appellant contends in his second issue that the "trial court erred by making improper judicial comments during voir dire, which rise to the level of fundamental error affecting Appellant's substantial rights."  Appellant points to the following five comments as violating his right to an impartial judge and a presumption of innocence:

- "Now, the presumption is that the defendant is presumed to be innocent. Doesn't mean he's innocent at all, but the presumption is certainly there with him right now as he sits at that table."

- "I have a high regard for the police. I used to be a police officer, but I know that police officers make mistakes and maybe 1 out of 10,000 might shave the truth; but that's a rare occurrence."

- "Frankly, a lot of defendants aren't the sharpest tools in the shed."

- "In some countries the verdict is not guilty, guilty and not proved guilty; but we don't have that here.  I kind of like it myself."

- "Okay.  I think we all know why we're here for, you know what you're here for, you know what you're required to do.  Also, I forgot to mention that

14

there's a fine that can be assessed in the case of up to $10,000. I always tell jurors don't worry about the fine, it goes to the State anyway and it just takes more time for y'all to make a decision."

Appellant acknowledges that he did not object to any of the trial judge's comments but claims that no objection was required to preserve his complaint for review because, "[i]n *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000), the Texas Court of Criminal Appeals found that unobjected to comments by the trial court during voir dire required reversal." Appellant states that, "[i]n the *Blue* opinions, four of the judges held fundamental error of constitutional dimension occurred because the unobjected to comments tainted the presumption of innocence, and a fifth judge concluded the unobjected to comments violated the right to an impartial judge." Appellant acknowledges that "*Blue* carrie[s] no precedential value, but [he claims it] could nevertheless be considered for any persuasive value it may have," and the comments he challenges here are "analogous to the statements in *Blue* and rise to the level of fundamental error requiring reversal."

The Court of Criminal Appeals recently addressed whether a complaint regarding a violation of Texas Code of Criminal Procedure article 38.05, which "prohibits a trial judge from commenting on the weight of the evidence in criminal proceedings or otherwise divulging to the jury [the judge's] opinion of the case," must be preserved in the trial court to be considered on the merits on appeal. *Proenza v. State*, 541 S.W.3d 786, 791 (Tex. Crim. App. 2017). In addressing whether there is a common law "fundamental error" exception to the rules of error preservation, the court reiterated that it "had already rejected the idea that 'fundamental error,' as a freestanding doctrine of error-preservation, exists independently from" the categorized approach the court set out in *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993). *Id.* at 793.

The court stated: "In *Marin*, we described the Texas criminal adjudicatory system as containing error-preservation 'rules of three distinct kinds: (1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request.'" *Id*. at 792 (quoting *Marin*, 851 S.W.2d at 279). The court "referred to these separate classifications as category-one, -two, and -three *Marin* rights, respectively." *Id*. If an alleged error falls into one of the first two *Marin* categories — if it involves (1) a violation of an absolute systemic requirement, or (2) a violation of a right that is waivable only — it may be raised for the first time on appeal. *See id*. All other complaints involve category three rights that are forfeited unless preserved. *See id*.

The court held that the *Proenza* defendant's "claims of improper judicial comments raised under Article 38.05 are not within *Marin*'s third class of forfeitable rights," but that the "right to be tried in a proceeding devoid of improper judicial commentary is at least a category-two, waiver-only right." *Id*. at 801. "Because the record does not reflect that Proenza plainly, freely, and intelligently waived his right to his trial judge's compliance with Article 38.05, his statutory claim in this matter is not forfeited and may be urged for the first time on appeal." *Id*.

In light of *Proenza*, we reject appellant's argument that his complaint of improper judicial comments made during voir dire must be addressed on the merits even without preservation in the trial court because the complaint involves "fundamental error." *See id*. at 792-801. Under *Proenza*, "There is no common-law 'fundamental error' exception to the rules of error preservation established by *Marin*." *Id*. at 793. And neither appellant nor the State address whether appellant's complaint involves a violation of a category one, two, or three right under *Marin*.

Nonetheless, assuming without deciding that appellant's complaint does not

16

need to be preserved in the trial court to be considered on appeal, we conclude that the trial court's statements in this case do not constitute error. In reaching this conclusion, we do not suggest that every statement at issue was appropriate.

We begin by addressing appellant's contention that the trial judge improperly commented on appellant's presumption of innocence and showed he was not impartial when he stated: "Now, the presumption is that the defendant is presumed to be innocent. Doesn't mean he's innocent at all, but the presumption is certainly there with him right now as he sits at that table." Appellant contends that "[t]his comment was further improper when combined with the court's statement" that "[i]n some countries the verdict is not guilty, guilty and not proved guilty; but we don't have that here. I kind of like it myself." According to appellant, "these comments were not necessary to explain the presumption of innocence" to the venire panel.

The trial judge's comment regarding the meaning of the presumption of innocence was not an incorrect statement. "[T]he presumption of innocence does not carry with it the connotation that a defendant is in fact innocent." *Zimmerman v. State*, 860 S.W.2d 89, 97 (Tex. Crim. App. 1993), *vacated on other grounds*, 510 U.S. 938 (1993); *Johnson v. State*, 263 S.W.3d 405, 417 (Tex. App.—Waco 2008, pet. ref'd). Thus, the presumption of innocence has no correlation with actual innocence. *Jessop v. State*, 368 S.W.3d 653, 673 (Tex. App.—Austin 2012, no pet.). "Rather, the presumption of innocence is merely an expression regarding the State's evidentiary burden and not a suggestion or intimation of the defendant's actual innocence." *Id.* at 673-74. The presumption serves as a reminder to the jury of the State's burden to prove its case and as an admonishment to consider nothing but the evidence adduced at trial in passing on the defendant's guilt. *Id.* at 674.

Here, the trial judge's explanation of a defendant's presumption of innocence was not wrong or improper nor did it express the trial judge's opinion regarding

appellant's guilt or innocence. After viewing all of the statements the trial judge made to the venire panel regarding the presumption of innocence, we conclude that the trial judge did nothing more than emphasize the importance of a defendant's right to the presumption of innocence and that the "State has the full and complete burden to prove that [defendant]'s guilty of this offense if it's able to do so."

Further, the trial judge's statement that some countries permit a verdict of "not guilty," "guilty," or "not proved guilty" and that he "kind of like[s]" that option is no expression of the trial judge's opinion regarding appellant's innocence in this case. Nor does the statement show any bias toward appellant or a lack of impartiality. The trial court's statement that he likes a third verdict option of "not proved guilty" is no expression of his belief that appellant is guilty in this case and thus is not improper.

We next address appellant's assertion that the following statements by the trial judge improperly demonstrated the trial judge's lack of impartiality and "informed the jurors of information that they would not normally have." Appellant focuses on these statements: "I have a high regard for the police. I used to be a police officer, but I know that police officers make mistakes and maybe 1 out of 10,000 might shave the truth; but that's a rare occurrence." According to appellant, these statements also "afforded the State's police witnesses more credibility" and "destroyed the presumption of innocence" especially because the State "relied on the testimony of police officers as to statements allegedly made by Appellant and their investigation and identification of Appellant."

Appellant presents the trial judge's statement out of context. When viewed in context, the challenged statements (1) follow the trial judge's explanation that it is the jury's "job to determine the credibility of witnesses that testify," and (2) are an admonishment to the venire panel not to afford police officers greater credibility

than any other witnesses:

Who do you believe? It's up to you, you determine credibility. Just because somebody says something doesn't mean they're lying. A lot of times attorneys like to make somebody admit that somebody's lying. Well, you're saying that that didn't happen then, so that means the other witness is lying.

Not necessarily. They could just as well be mistaken. With police officers, for an example, it doesn't matter if they have a uniform on or not, the law says very clearly that everyone that takes the stand starts off on the same, equal footing as every other witness does. Just because they have a uniform on does not mean that everything that comes out of their mouth is absolute truth.

Some people might think that because, well, they're an officer, they're trained. But the reality is police officers make mistakes just like we do. So how do you know? Until you listen to what they've got to say, do you know something about their background before you formulate an opinion that you're going to give them a step up and more credibility than an ordinary citizen? Some people seem to think that and it just doesn't make sense because in reality that's not what you do.

Everyone must start off equally. I have a high regard for the police. I used to be a police officer, but I know that police officers make mistakes and maybe 1 out of 10,000 might shave the truth; but that's a rare occurrence. But the reality is until you hear what they're [sic] got to say, you cannot and must not give them a step up in their testimony until you hear what they've said.

We had one not terribly long ago where he was testifying about what happened. The cross-examination by the defense attorney brought up the fact that he had just been reinstated to the department after a three-month suspension for fabricating an offense report to help a friend out. Well, there goes his credibility; but how would you know that until you hear what you've heard on the stand? So that's why everyone must start out equal.

Anybody think that just because somebody walks up there and they sit there and they've got a police officer's uniform on, or they've got a habit on, or anything else that would designate them as somebody in your mind that basically you kind of put on a pedestal, whether it be a doctor, or nurse, or rabbi, or anybody?

19

> Does everybody understand until you hear from them that they start off equally? Anybody going to say, Yeah, if it's a police officer I'm going to believe whatever he says? Do you see where that's — there's a flaw there? Because you're not saying that he's going to lie to you, but he is human and he can or she can make mistakes. And the only way you know that is listen to what they've got to say and then decide how much credibility you're going to give to them.
>
> So all of that is basically to make sure you understand that everybody starts off equally.

Here, the trial judge emphasized the importance of not affording a police officer's testimony greater credibility just because he is a police officer. The trial judge admonished the venire panel that "everyone must start off equal" and to not give police officers more credence. The trial judge even gave an example of a police officer who was untruthful and urged the venire panel to not afford anyone more credibility because of their profession — be that a police officer, doctor, nurse, or rabbi.

We conclude that these challenged statements by the trial judge neither showed a lack of impartiality nor "destroyed" appellant's presumption of innocence.

We now turn to appellant's argument that the trial judge's statement that "a lot of defendants aren't the sharpest tools in the shed" was not "necessary to explain the accused's right against self-incrimination" and "this statement again demonstrated [the trial judge's] lack of impartiality in the trial."

The trial judge gave the following explanation to the venire panel regarding a defendant's right not to testify and the possible reasons why a defendant might choose not to testify:

> If the defendant elects to testify, you listen to what he's got to say and you decide if he's credible or not. And you judge that by whatever you learn about it, whatever he answers, whatever he questions. He does not have to testify. Whether he testifies or not, I have no idea. But if he does testify, you listen to what he's got to say

20

and you judge his credibility like everybody else.

What you can't do is go back to the jury room in a day or so, if [he] elects not to testify and said, Huh, he didn't testify. I'm going to use that against him. That makes me believe he's guilty and I'm going to — that's going to aid me in voting guilty even if I don't think the State's proved the case to me completely like it should.

And you absolutely can't do that. Because what you're doing is you're manufacturing evidence that never came out of this person's mouth and you're drawing a conclusion about why he did not testify when if he doesn't, you don't know why. Frankly, a lot of defendants aren't the sharpest tools in the shed. They have advice of their counsel. Their attorney may say, I would not get up there to testify if I were you. You know how nervous you are. You know how shaken you can get being in front of these people. The State, as well as the defense, are trained to ask questions in such a way to get a particular answer. You know you can get confused easily. It may not be to your best interests to testify.

Plus you, as the defendant, get to hear the entire State's case before you ever decide if you're going to call your client to testify or not. Many times the attorney will say, There's no reason for you to testify. The State's not proved its case, in my opinion. And if you get up there and just act really nervous, you're just going to make me think — jurors will think, well, because you are nervous, you must be guilty.

. . . So that's why you can't decide and you can't use the fact, if a person elects not to testify, why he did it.

The trial judge's statements viewed in their entirety show that he attempted to explain to the venire panel that a defendant has a right not to testify and admonished the panel that a jury may not hold it against the defendant if the defendant chooses not to testify. The trial judge's statements show that he attempted to present the venire panel with several reasons for why a defendant may choose not to testify. Although the trial judge's statement that "a lot of defendants aren't the sharpest tools in the shed" was indelicate, the statement in no way conveyed that the trial judge had a negative opinion about appellant's intelligence or about appellant in general. Even looking at the trial judge's single unrefined statement, we conclude that it does

21

not show the trial judge was biased against appellant in this case.

Lastly, we review appellant's argument that the following statements by the trial judge "demonstrate[] his lack of impartiality and violate[] Appellant's presumption of innocence:" "Okay. I think we all know why we're here for, you know what you're here for, you know what you're required to do. Also, I forgot to mention that there's a fine that can be assessed in the case of up to $10,000. I always tell jurors don't worry about the fine, it goes to the State anyway and it just takes more time for y'all to make a decision."

Appellant contends these statements violated his right to an impartial judge and to a presumption of innocence because they show the trial judge "expects a guilty verdict and doesn't want the jury to take too long in assessing punishment or be bothered with considering the full range of punishment as the money just goes to the State anyway." Given the context in which these statements were made, we disagree.

Before the trial judge made the challenged statements, the judge explained that jurors must find appellant not guilty unless the jurors are "convinced beyond a reasonable doubt that the State has proved its case." The judge then admonished the venire panel on the statutory punishment range for an attempted sexual assault and questioned the panel if any venire members were unable to "consider the full range of punishment in this case." The judge spent time answering the venire members' questions regarding the punishment range, including the possibility of assessing probation, and then again asked if any venire members could not consider the full range of punishment for any reason. The judge then made the following statements:

> Anybody other questions before I turn it over to the attorneys?
>
> Okay. I think we all know why we're here for, you know what you're here for, you know what you're required to do. Also, I forgot to

22

mention that there's a fine that can be assessed in the case of up to $10,000. I always tell jurors don't worry about the fine, it goes to the State anyway and it just takes more time for y'all to make a decision. We had one back there for hours trying to give the money to 10 different relatives. So . . .

And after it was over with, I said, What took so long? And they said, Well, you know, we couldn't decide if Aunt Betty was getting $300 or $400. The money goes to the State so I always say, Don't worry about the fine.

When viewed in their entirety, nothing in the trial judge's statements to the venire panel indicates that he expected a guilty verdict and did not want the "jury to take too long in assessing punishment or be bothered with considering the full range of punishment." He told the venire panel that, "if we get to punishment, in the punishment it also must be unanimous." No expectation of a guilty verdict was conveyed.

Our task here is not to assess the propriety of every challenged statement made by the trial judge during voir dire; it is, instead, to decide whether the challenged statements violated appellant's right to an impartial judge or to the presumption of innocence. *Cf. Davis v. State*, 651 S.W.2d 787, 790 (Tex. Crim. App. 1983) (Court rejected appellant's contention that guilt and eventual conviction were assumed in trial judge's instruction to panel before voir dire to the effect that "if the jury does not follow the law under the instructions of the Court that this cause will have to be tried" again. "The instruction in question is not a proper one to be given in the trial of a criminal case. Nonetheless, under the circumstances, we conclude that it was not reasonably calculated to benefit the State or prejudice the defendant."). Considering the trial judge's statements in context, we conclude that they did not bear on the presumption of innocence or show the trial judge was biased and not impartial. Because the trial judge's comments do not show a lack of impartiality or undermine the presumption of innocence, his comments do not constitute error.

23

Accordingly, we overrule appellant's second issue.

## III.   Charge Error

Appellant argues in his first issue that he was egregiously harmed because the trial court erroneously failed to include a *sua sponte* instruction in the jury charge that would have told the jurors that extraneous offenses and bad acts could not be considered in assessing punishment unless they were proven beyond a reasonable doubt.  Appellant argues that, without this instruction, it was possible for the jury to base its assessed punishment on an alleged extraneous offense that was not proven beyond a reasonable doubt.

### A.   Erroneous Jury Charge

The State may offer punishment phase evidence as to any matter the court deems relevant to sentencing, including evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant. Tex. Code Crim. Proc. Ann. art.  37.07 § 3(a) (Vernon Supp. 2017).  Article 37.07 is the law applicable to the case.  *See Sansom v. State*, 292 S.W.3d 112, 125 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *see Delgado v. State*, 235 S.W.3d 244, 252 (Tex. Crim. App. 2007).  When evidence of extraneous offenses or bad acts is admitted during the punishment phase, the trial court is required to instruct the jury *sua sponte* on the reasonable doubt standard of proof.  *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000).  Failure to include such an instruction is considered charge error and should be reviewed under the standards set out in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988).  *Id*. at 484-85.

Here, the State introduced evidence from a Burns Bail Bonds employee,

Shannon Burns-Pena, at the punishment phase of trial. She testified that her bonding company posted a $30,000 bond for appellant, but he failed to appear for trial on September 26, 2016. Burns-Pena testified that she tried to call appellant on the morning of September 26 but could not reach him. When she tried to locate appellant through his GPS ankle monitor, she learned that the monitor battery had died the day before and she was unable to locate him. Burns-Pena testified that appellant's last known location was "somewhere along County Road 382 in Cleveland, Texas." Burns-Pena's testimony constitutes evidence of the extraneous offense of bail jumping and failure to appear. *See* Tex. Penal Code Ann. § 38.10 (Vernon 2016).

The trial court's charge instructed the jury as to the range of punishment, parole law, and the defendant's right to remain silent. The charge did not instruct the jury that the State was required to prove an extraneous offense beyond a reasonable doubt or give a definition of reasonable doubt. Appellant raised no objections to the charge or requested an instruction on the State's burden of proof. Nonetheless, the trial court erred by failing to include the statutorily required instruction *sua sponte* on the reasonable doubt standard of proof regarding extraneous offense evidence. *See Huizar*, 12 S.W.3d at 484.

### B. No Egregious Harm

Because appellant failed to object to the jury charge or request the reasonable doubt instruction, he can obtain reversal only if the error caused appellant egregious harm. *See Almanza*, 686 S.W.2d at 171; *Orellana v. State*, 489 S.W.3d 537, 543 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Under this high standard, the judgment may be reversed only if the error is so egregious and creates such harm that it deprives the accused of a fair and impartial trial. *See Almanza*, 686 S.W.2d at 172; *Orellana*, 489 S.W.3d at 543.

Appellant is denied a fair and impartial trial when the error (1) went to the very basis of the case; (2) denied the accused a valuable right; or (3) vitally affected the accused's defensive theory. *Orellana*, 489 S.W.3d at 543; *Sansom*, 292 S.W.3d at 128. The degree of harm is reviewed in light of the entire jury charge, the state of the evidence, argument by counsel, and any other relevant information revealed by the trial record as a whole. *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011); *Orellana*, 489 S.W.3d at 543-44. An egregious harm determination must be based on a finding of actual rather than theoretical harm. *Cosio*, 353 S.W.3d at 777.

We begin our harm analysis by reviewing the jury charge at the punishment phase. Although the trial court failed to instruct the jury not to consider the extraneous offense evidence unless it was proven beyond a reasonable doubt, the charge generally told the jury that the State had the burden of proof throughout the trial. The trial court's charge to the jury stated: "The burden of proof in all criminal cases rests upon the State throughout the trial and never shifts to the defendant." Neither the parties nor the trial court added to the charge error by telling the jury that the burden was anything less than "beyond a reasonable doubt." And, the jury charge during the guilt-innocence phase of trial, which was given just a day earlier, instructed the jury that the State's burden was beyond a reasonable doubt.

We conclude the general jury charge instruction is a consideration that weighs neither for nor against the conclusion that appellant suffered egregious harm. *See Orellana*, 489 S.W.3d at 545; *Martinez v. State*, 313 S.W.3d 358, 367 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

We next review the state of the evidence. Appellant does not dispute that the State presented ample evidence of appellant's guilt. Complainant testified during the guilt-innocence phase of trial that appellant attacked her in the ladies' restroom, choked her, and attempted to sexually assault her. The record shows that

26

complainant's testimony was consistent with the statements she made to the cashier and the forensic nurse examiner shortly after the attack. The cashier confirmed that complainant had visible red marks on her neck, and photos taken of complainant after the attack show numerous red marks on her neck.

The State also presented compelling testimony from Burns-Pena regarding the extraneous offense of bail jumping and failure to appear. Burns-Pena testified that her bonding company posted a $30,000 bond for appellant. After appellant appeared on the first day of trial when the jury was selected, he failed to appear on the second day of trial on September 26, 2016, or any day thereafter. She testified that she tried to call appellant on the morning of September 26, but she was unable to reach him. She tried to locate appellant through the GPS ankle monitor he was supposed to wear but she learned that the monitor battery had died the day before and she was unable to locate him. She stated that appellant's last known location was somewhere "far north" in Cleveland, Texas.

Burns-Pena testified that she explains to her bond clients that the battery must be charged; she ensures the clients "follow-up and continue to charge the devices;" and she ensures that her "clients know when they are supposed to appear in court." She testified that the battery had died twice in the past but that appellant contacted the bonding company to report it "as soon as it did happen." She testified that appellant did not call to report there was a problem with the battery this time. She also testified that neither appellant nor a co-signor with financial responsibility or anyone else contacted the bonding company "with any explanation as to why the defendant hasn't appeared in court." And, no one provided the bonding company with information that appellant had "any type of medical emergency" or was in the hospital. According to Burns-Pena, appellant made no effort to contact the bonding company to give his whereabouts or explain his failure to appear.

27

Burns-Pena provided clear, strong, and direct evidence; appellant's counsel did not present any evidence challenging her testimony. Despite the lack of a reasonable doubt instruction in the jury charge, the evidence was clear, strong, and direct. *See Orellana*, 489 S.W.3d at 544; *Martinez,* 313 S.W.3d at 367-68. Additionally, appellant's absence from the courtroom after the first day of trial obviously would have been apparent to the jury. "It is difficult to ascribe 'egregious harm' to the trial court's failure to instruct the jury not to consider extraneous offense . . . evidence in assessing punishment unless they found beyond a reasonable doubt that appellant committed such extraneous offense[] . . . when clear-cut evidence credits appellant for" the offense. *Allen v. State*, 47 S.W.3d 47, 53 (Tex. App.—Fort Worth 2001, pet. ref'd).

We conclude that the state of the evidence weighs against a determination that appellant suffered egregious harm from the omission of a reasonable doubt instruction. *See Orellana*, 489 S.W.3d at 544; *Martinez,* 313 S.W.3d at 367-68.

Turning to closing argument of the punishment phase, we note that the argument of appellant's trial counsel was short and did not challenge any evidence the State presented in this case — whether during the guilt-innocence or punishment phase of trial. Appellant's trial counsel did no more than state to the jury as follows: "I don't have too much to say to you, except that I was able to prove up that Mr. Loge did not have a criminal offense on his record in Harris County. I'd just ask that you take into consideration, when you're sentencing him, that fact. Thank you."

The State referred to appellant's failure to appear for trial at the beginning of its closing argument but then focused on the nature of the charged offense and the need to assess the maximum punishment, including a fine. The State emphasized the particular facts of the attempted sexual assault, how appellant hid in a restroom stall to attack complainant, and then strangled her, causing her injuries. The State

argued that complainant "will live with what happened to her for the rest of her life," and that appellant "has sentenced her to a lifetime of fear." The State asked the jury to assess the maximum punishment because the "facts of this case are appalling," and "[i]t should offend you that you can only sentence this defendant to 10 years." The State asked the jury to speak not only for complainant but to speak for "all of us in the community to tell the defendant" that he "deserve[s] a sledge hammer."

Considering that the State gave multiple reasons for a maximum punishment unrelated to the extraneous offense, and that appellant's trial counsel failed to mount any challenge to the existence of the unadjudicated extraneous offense or argue strongly for more lenient punishment, we conclude that the arguments of counsel weigh against a holding of egregious harm. *See Orellana*, 489 S.W.3d at 545; *Martinez*, 313 S.W.3d at 369.

In addressing other relevant information, we consider the severity of the punishment assessed. Although appellant's punishment was the maximum available for an attempted sexual assault, it was within the statutory sentencing range and does not demonstrate egregious harm to appellant, especially considering the circumstances of the charged offense. *See Allen*, 47 S.W.3d at 53.

Applying the egregious harm standard to this record, we conclude that a review of all relevant factors does not show that appellant was egregiously harmed by the omission of a reasonable doubt instruction regarding evidence of the extraneous offense of bail jumping and failure to appear. *See Huizar v. State*, 29 S.W.3d 249, 250-51 (Tex. App.—San Antonio 2000, pet. ref'd) (concluding that error in failing to instruct the jury at punishment on the reasonable doubt standard concerning extraneous offenses did not constitute egregious harm, even though the State "relied on substantial evidence of extraneous conduct in seeking punishment," the State "commented during the State's closing argument that the State had no

burden of proof during the punishment trial," and the jury assessed a 99-year punishment). The charge error did not affect the very basis of the case, deprive appellant of a valuable right, or vitally affect a defensive theory. Therefore, the trial court's error was not so egregious as to deprive appellant of a fair and impartial trial. *See id*. We overrule appellant's first issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/     William J. Boyce
          Justice


Panel consists of Chief Justice Frost and Justices Boyce and Jewell.
Publish — Tex. R. App. P. 47.2(b).