**Affirmed and Memorandum Opinion filed April 27, 2023.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-21-00556-CR

**CARLOS EDMOND BARNES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1632376**

## MEMORANDUM OPINION

Appellant Carlos Barnes appeals his conviction of aggravated sexual assault of a child. A jury found appellant guilty and assessed his punishment at five years in prison. In a single issue, appellant contends that the trial court erred in failing to instruct the jury sua sponte regarding the statutory definition of "element of the offense." Because any such error did not cause appellant egregious harm, we affirm.

## *Background*

A.A., complainant, is fourteen years younger than appellant. In 1998, when A.A. was six years old, she was living with her parents and siblings in an apartment in Houston, Texas. The family was forced to relocate to A.A.'s grandparent's house after a fire.

When A.A. was twenty-five years old, she made a delayed outcry to the U.S. Army Criminal Investigation Division that appellant sexually abused her on two separate occasions—once while she was staying at her grandparent's house and again when appellant was visiting her parent's house during the holiday season.

Appellant was ultimately charged by indictment with aggravated sexual assault of a minor, alleged to have been committed on December 1, 1998, in Harris County, Texas. Specifically, appellant was charged with unlawfully, intentionally, and knowingly causing the sexual organ of A.A., a person younger than fourteen years of age, to contact the mouth of appellant.

At trial, A.A. testified about the events leading up to the abuse. She testified generally about her family but described her relationship with her brother, Alexander Hernandez, as "sibling besties." She stated that they were only a year a part and liked to play together. She stated that while living at an apartment, she and Hernandez were playing with fire and burning candles in the apartment. Subsequently, the couch in the apartment caught fire and the apartment was severely damaged. The family relocated to A.A.'s grandparent's home in Cypress, Texas. Along with A.A.'s grandparents, A.A.'s immediate family shared the house with A.A.'s great-grandfather and uncle (appellant's twin brother). A.A. could not recall if appellant actually lived at the grandparent's home, but she asserted that he spent the night on several occasions.

A.A. described two specific instances of abuse to the jury. The first incident occurred at her grandparent's house when she was six years old. She explained that while living at her grandparent's house, she usually slept in the bedroom with her family, but sometimes slept in the living room. One night, she fell asleep on the living room couch. She remembered being awakened by a "burning sensation and pain or pressure on [her] vagina area." She stated that she peeked down, and appellant told her to "shh." A.A. avowed that appellant had his "mouth and teeth on [her] vagina, and he was fondling [her] with his fingers." During the assault, A.A. remembered seeing appellant's face and "a lingering smoker's smell." She also acknowledged that in 1998, appellant was slimmer with a little bit of facial hair but could not recall if appellant was in the military at this time. A.A. testified that she partially disclosed this instance of sexual abuse to Hernandez when she was in the eighth grade.

The second incident of sexual abuse occurred between 2005 and 2006 when A.A. was thirteen or fourteen years old and her family had moved out of her grandparent's home. She remembered that appellant was already enlisted in the military and was visiting her mother, appellant's sister, around Thanksgiving. A.A. testified that appellant came into her bedroom late at night, caressed her upper thigh, rubbed her butt, and "proceeded to put his mouth on [her] vagina area."

During the punishment phase of trial, A.A.'s brother, A.A.'s former husband, a detective with the Harris County Sheriff's Office, a supervisory special agent with the U.S. Army, and a staff psychologist with the Children's Assessment Center also testified regarding A.A.'s delayed outcry and the sexual abuse investigation.

Appellant testified at trial. He generally described his family and told the jury that he had a twin brother that lived at his parent's home at the same time A.A. and her family lived there. He also provided substantial testimony about his military

career and accomplishments. He denied sexually abusing A.A. and asserted that he never spent the night at his grandparent's house at the time she and her family were residing there. He also testified that he never visited his sister during the holiday season in 2005. The trial court admitted a copy of appellant's Leave and Earning Statements from 2005 to 2008. These leave statements reflected that he took leave in August 2005 and September 2005.

Appellant's other sister and wife also testified at trial. Each asserted that they never observed any inappropriate interactions or behavior between A.A. and appellant.

At the conclusion of the testimony, the trial court excused the jury for deliberations. During deliberations, the jury sent a note to the trial court, which stated: "Pg 5 paragraph 2, line 2 'unless each element'. What are the elements? They are not listed out in the indictment." The trial court declined to answer and directed the jury to the jury charge. The jury continued deliberations and found appellant guilty of aggravated sexual assault and sentenced him to five years' imprisonment.

### *Discussion*

In his sole issue, appellant argues that the trial court erred in failing to instruct the jury sua sponte on the statutory definition of "element of the offense." Appellant asserts that he suffered egregious harm as a result. For the reasons set forth below, we disagree.

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In a criminal case, we review complaints of jury charge error in two steps. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015). First, we determine whether error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App.

4

2005). If not, our analysis ends. *Kirsch*, 357 S.W.3d at 649. Second, we review the record to determine whether sufficient harm was caused by the error to require reversal of the conviction. *Id.* The degree of harm necessary for reversal depends on whether the appellant preserved error by objecting to the charge. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). When charge error is not preserved, as in this case, reversal is not required unless the resulting harm is egregious. *Id.*; *see also* Tex. Code Crim. Proc. art. 36.19; *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015).

Charge error is egregiously harmful when it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006). That is, the error must have been so harmful that the defendant was effectively denied a fair and impartial trial. *Almanza*, 686 S.W.2d at 172. Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Under *Almanza*, the record must show that the charge error caused the defendant actual, rather than merely theoretical, harm. *Ngo*, 175 S.W.3d at 750. Neither party has the burden to show harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

Interpreting the jury's note as a request to define the phrase "element of the offense," appellant contends that the trial court was required to instruct the jury on the statutory definition of that phrase. Assuming without deciding error on the trial court's part, we conclude that any error was not egregious. Tex. R. App. P. 44.2(b). In determining whether appellant was deprived of a fair and impartial trial, we review "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686

5

S.W.2d at 171. We will examine "any . . . part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused." *Id.* at 174.

**A.A.'s Testimony**. A.A. testified that she was previously married to Robert Alvarez and shared a six-year-old daughter with him. While testifying about her daughter, she became emotional because her daughter reminded her of herself at a similar age. A.A. stated that she grew up in the Houston area and began living with her grandparents when she was six years old. While residing at her grandparent's house, she asserted that appellant sexually abused her.

She testified that while she was asleep on the couch, she remembered "being woken up to a burning sensation and pain or pressure on [her] vagina area." She asserted that she was still partially asleep and saw appellant "mouthing on [her] vagina area." When she "peeked" down at him, he told her to "shh." She stated that appellant's mouth was touching her vagina area, and he was "fondling" her with his fingers. She testified that it "felt like someone was biting [her]" and that she could feel appellant's teeth on her vagina.

She stated that she did not say anything because he was her uncle and "you're taught to trust family." At the time, A.A. was too scared and did not understand what was happening to her. She believed it was "supposed to happen" so she laid there while he continued. A.A. recalled the smell while appellant was assaulting her. She described a "smoky smell" that was "[k]ind of like a lingering smoker's smell that . . . stains your clothes." She was certain that appellant was the person that assaulted her because she saw him with her own eyes.

A.A. also testified about a second assault when she was around thirteen or fourteen years old. She asserted that her family moved from her grandparent's house into a two-story house in Houston. She explained that there were two bedrooms downstairs, and two bedrooms upstairs. Her parents and brothers were in the

downstairs bedrooms, and she and her sister were in the upstairs bedrooms. Around Thanksgiving 2005, appellant came to visit. He slept in A.A.'s sister's bedroom, and A.A.'s sister stayed in the bedroom with A.A. She explained to the jury that she would try not to shower because she "figured if it maybe smelled bad enough that he just wouldn't want to go near there." She regularly refused to shower or faked a shower if she knew appellant was visiting.

One night, A.A. described hearing her bedroom door squeak and that she "kind of already knew what was going to happen." She asserted that she was sleeping on the floor and her sister was asleep in the bed. Appellant laid on the floor and started "caressing [her] upper thigh . . . [and] rubbing [her] butt." She testified that appellant "proceeded to put his mouth on [her] vagina area." She recalled appellant "pulsating with his mouth." She stated at one point, appellant's teeth caused her "to flinch because of the pain." A.A. did not say anything or make any noise.

Prior to the second incident, she disclosed most of what happened during the 1998 incident to Hernandez. She stated that shortly after disclosing what happened to Hernandez, she finally understood that she had been molested after taking a "special" class in middle school that dealt with sexual abuse. She explained that she felt "sad and embarrassed . . . that [it] could happen to [her]." She acknowledged that both incidents occurred in Harris County, Texas. However, it is disputed whether she was under the age of fourteen at the time of the second sexual assault.

A.A. testified that because appellant was in the military, her perception of people in the military changed. She asserted that her experience with appellant made her almost "hate them" and that she "couldn't trust the very people that were . . . supposed to be protecting us." Her perception of military personnel impacted her relationship with Alvarez. When they first began dating, Alvarez was in the Coast Guard. Initially, A.A. did not realize that it was a branch of the military but upon

7

learning that Alvarez was in the military, it "opened a lot of wounds" she previously tried to suppress regarding appellant. A.A. did not initially tell Alvarez what appellant did to her because she did not want him to think less of her or that she was "nasty." During her relationship with Alvarez, she recalled one occasion where appellant came to visit A.A.'s daughter shortly after she was born. She did not know appellant was coming and did not stay in the same room as him.

**Other Testimony**. During its case-in-chief, the State called several other witnesses to testify. Hernandez, A.A.'s brother, testified that she is his older sister. He stated that when they were growing up, they were very close and told each other everything. He mirrored A.A.'s testimony regarding the events at the apartment that forced their family to relocate to their grandparent's house. He also expounded on his and A.A.'s relationship with their uncles (appellant and appellant's twin brother). He testified that appellant's twin brother lived with them at their grandparent's house but was unsure if appellant lived there also. He recalled that there were times that appellant spent the night. Hernandez asserted that when A.A. was about six or seven, he noticed a change in her demeanor. According to Hernandez, A.A. had a good relationship with appellant's twin brother and would only act "withdrawn" when appellant was around.

Alvarez, A.A.'s former husband testified that he previously served in the Coast Guard and was now in the Reserves. He testified that he met A.A. at a bar in November 2013 when he was newly stationed in Houston. He explained that their relationship was "kind of fast" and within seven weeks, they were married and had a baby on the way. He asserted that as soon as A.A. found out she was pregnant, her behavior changed. He described her behavior as more aggressive, verbally abusive, and destructive. He stated that she was not very affectionate and disliked military personnel. Alvarez recalled meeting appellant one time shortly after his and A.A.'s

8

daughter was born. He testified that upon seeing appellant, A.A.'s demeanor was more "reserved" compared to her "social and outgoing" behavior with other family members. Alvarez also testified regarding difficulties A.A. had at nighttime and explained that nighttime was very difficult for her. He testified that he knew not to approach A.A. while she was sleeping because she would get mad at him and would "gasp and be scared." He asserted that in 2017, A.A. disclosed to him why she had issues at nighttime. He described her demeanor throughout the conversation as "nervous" and "scared." Alvarez and A.A. later divorced in July 2021.

Adam Santana, a detective with the Harris County Sheriff's Office, testified that he was asked to investigate a case involving appellant that was referred by a special investigator with the U.S. Army. He averred that the U.S. Army initially investigated appellant because he was currently serving with the military. Santana acknowledged that A.A. was not a child at the time of his forensic interview but was a minor at the time of the offenses. Santana asserted that A.A.'s initial outcry was in Alaska where she was living with Alvarez. He reviewed the interview where A.A. detailed appellant's sexual abuse. During the investigation, appellant cooperated, and Santana also reviewed appellant's interview with Supervisory Special Agent Alexander Brown.

Brown, a special agent with the U.S. Army, Criminal Investigation Division, testified regarding his interview with A.A. He testified that he interviewed her in February 2018. During the interview, Military Special Victims Counsel was present. He explained that the special victims counsel "acted as a liaison to victims of crimes to help guide them . . . through the legal process and understand their rights." During the interview, Brown described A.A. as calm but explained that her demeanor would change and become more emotional when discussing specifics of her experience. Brown testified that A.A. disclosed two separate incidents of sexual assault

committed by appellant.

Dr. Whitney Crowson, a staff psychologist with the Children's Assessment Center also testified. Though she did not meet with A.A., she provided general testimony regarding the dynamics of sexual abuse and described the types of behaviors that children may exhibit when they were the victim of sexual abuse.

During the appellant's case-in chief, several witnesses, including appellant, testified regarding his history with A.A. Appellant generally testified that he was born in 1978, had a twin brother who he is not very close with, lived in Houston, Texas since he was fourteen years old, and earned multiple degrees. He also testified regarding his appearance in 1998 and specified that he had long braids like the character "O-Dog" in the movie Menace II Society. Additionally, he provided substantial testimony about his military career, which began in 2000 and ended in 2018 after two combat tours.

Appellant testified that he has known A.A. since she was born. Growing up, appellant resided with his mother, A.A.'s grandmother, until he was kicked out of the house at the age of sixteen because he was hanging with the "wrong friends." He went back to his mother's house periodically until he completely moved away at eighteen years old. He testified that in 1998, he did live with his mother for a period of time but stated that he was not living there at the time the "so-called incident occurred."

He acknowledged visiting his mother's home when A.A. and her family were staying there in 1998. He, however, denied spending the night or having any inappropriate contact with her. He denied touching A.A.'s genitals or otherwise touching her in any inappropriate manner. Appellant testified that he visited A.A.'s mother in 2004 with his then wife but denied visiting around the Thanksgiving holiday in 2005. To corroborate his assertion that he did not visit during the holiday

10

season, appellant offered, and the trial court admitted against the State's objection, a copy of his Leave and Earning Statements from 2005 to 2008. His leave statement reflected that he took leave between August 2005 and September 2005 for a total of fifty-two days. When questioned about his reasoning for taking leave, he stated that he was having issues with his combat experience and "took a little time off to see a specialist." There was no other leave recorded in 2005.

Appellant's sister, Samantha Marino, testified on his behalf. She testified that in 1996, appellant had his own residence on the southwest side of Houston. She asserted that she was not aware that he ever stayed the night at their mother's house after 1996. Appellant's former wife, Cecilia Cruz, also testified. She asserted that she met appellant in the military in 2003, and they share a daughter together. She avowed that she travelled with appellant to Houston in 2004, and they stayed with his sister, A.A.'s mother. They shared a room together, and she never observed any unusual contact or behavior between appellant and A.A. during that visit. She indicated that they also travelled to Houston in May 2005. Again, she testified that they stayed with his sister, shared a room, and that she did not observe anything inappropriate between appellant and A.A.

**Argument of Counsel**. The defense's theory was that appellant never sexually assaulted A.A. During closing arguments, appellant argued that there was no credible witness that could accurately identify him as the person who committed any offense against A.A. beyond a reasonable doubt. Appellant highlighted the testimony of two witnesses that stated that they never observed any inappropriate interaction between appellant and A.A. He also indicated that A.A. was unable to identify key distinguishing characteristics about his hair and alluded to testimony that he had a twin brother who stayed at A.A.'s grandparent's house at the time A.A. was sexually assaulted.

11

In contrast, the State's closing statements emphasized the consistency of the witnesses' descriptions of A.A.'s grandparent's house, A.A.'s recollection of the sexual assaults, and A.A.'s demeanor around appellant. The State noted that the abuse occurred at nighttime when A.A. was awakened by appellant's mouth on her vagina. The State referenced Alvarez's testimony that he could not touch A.A. at night because it caused her to panic. The State further pointed to the psychologist's testimony that when a person is confronted with an act similar to the abuse sustained that it could be a trigger. The State stressed that it was irrelevant that A.A. did not identify appellant's hair because she saw his face.

**Jury Charge**. The jury charge instructed the jury that "a person commits the offense of aggravated sexual assault if the person intentionally or knowingly causes the sexual organ of a child to contact the mouth of another person, including the defendant; and if the victim is younger than fourteen years of age." During deliberations, the jury sent a note to the trial court that read as follows:

> Jury Note No. 1: "Pg 5 paragraph 2, line 2 'unless each element'. What are the elements? They are not listed out in the indictment."

> The trial court responded: "The Court, under the law, is not permitted to answer the question you have presented. Please consider the jury charge that you have been given & continue with your deliberations."

Appellant contends that the trial court's failure to define "element of the offense" ensured that the jurors would "arbitrarily apply their own personal definitions of the term" and that the definition was required to "assure a fair understanding of the evidence that must be proved." The State suggests that the definition of "element of the offense" is not opaque and that a common understanding would be less restrictive, thus benefitting appellant.

Applying the reasoning in *Olveda*, we previously held that when a statutory definition is not included in the charge, it is assumed that the jury would consider

12

the commonly understood meaning in its deliberations. *See Nejnaoui v. State*, 44 S.W.3d 111, 120 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (quoting *Olveda v. State*, 650 S.W.2d 408, 409 (Tex. Crim. App. 1983)). The "failure to give an abstract instruction is reversible only when such an instruction is necessary to correct or complete understanding of concepts or terms in the application part of the charge." *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), overruled on other grounds by *Malik v. State*, 953 S.W.2d 234 (1997).

Here, the trial court provided the statutory definitions of "child," "intentionally," and "knowingly" in the abstract portions of the charge. The first application paragraph applied the facts of the case to the law of aggravated sexual assault. The essence of the jury's note was a request to identify the elements that the state was required to prove. The court referred the jury to the charge, which instructed the jury on the required elements of the charged offense. It specifically instructed the jury that they must unanimously find that on December 1, 1998, appellant did unlawfully, intentionally, or knowingly cause the sexual organ of A.A., a person younger than fourteen years of age, to contact the mouth of appellant. Because the application paragraph directed the jury to the facts of the case, the absence of the statutory definition of "element of the offense" could not have confused the jury. Even if the omission of the definition was error, the error was not so harmful as to deny appellant a fair and impartial trial. *See Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986); *see also Macias v. State*, 959 S.W.2d 332, 336–37 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

Taking the record as a whole, we believe that a review of all relevant factors shows that appellant was not egregiously harmed by the trial court's failure to instruct the jury sua sponte on the statutory definition of "element of the offense." The charge error, if any, did not affect the very basis of the case, deprive appellant

of a valuable right, or vitally affect a defensive theory. *See Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011). Therefore, any error was not so egregious as to deprive appellant of a fair and impartial trial. *See Loge v. State*, 550 S.W.3d 366, 386 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

### *Conclusion*

Having concluded that the record demonstrates that appellant was not egregiously harmed by the trial court's failure to instruct the jury sua sponte on the statutory definition of "element of the offense," we overrule appellant's sole issue. We affirm the trial court's judgment.


/s/    Frances Bourliot
        Justice


Panel consists of Justices Jewell, Bourliot, and Zimmerer.

Do Not Publish — Tex. R. App. P. 47.2(b).