

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00056-CR

CASSANDRA LEWIS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th District Court
Morris County, Texas
Trial Court No. 12,534 CR

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

Cassandra Lewis woke the morning of April 7, 2022, to find her seven-month-old baby, Jessica,[1] unresponsive. Lewis was later convicted of abandoning or endangering a child,[2] a state jail felony. After presentation of evidence of two prior state jail felony convictions, Lewis was sentenced to ten years' imprisonment and fined $5,000.00.[3]

On appeal, Lewis claims that (1) there were no exigent circumstances justifying law enforcement entering into the motel room where Lewis and her baby had been sleeping, (2) the trial court erred to allow a parental rights order into evidence, (3) she suffered egregious harm when the trial court failed to instruct the jury at punishment that extraneous offenses were only to be considered if they were proved beyond a reasonable doubt, and (4) the State failed to prove beyond a reasonable doubt that Lewis was the same person convicted in a judgment offered into evidence at the punishment stage.

While we find no reversible error, the trial court's judgment incorrectly states the statute of offense. We modify the judgment to reflect the correct statute. As modified, we affirm the trial court's judgment.

I.    **Background Facts**

Sergeant Susan Laake of the Daingerfield Police Department (DPD) responded to a report of an infant not breathing at the Relax Inn in Daingerfield on the morning of April 7,

---

[1]We use pseudonyms for minor children involved in this case. *See* TEX. R. APP. P. 9.10.

[2]*See* TEX. PENAL CODE ANN. § 22.041 (Supp.). In the same trial, the jury acquitted Lewis of criminally negligent homicide. *See* TEX. PENAL CODE ANN. § 19.05.

[3]*See* TEX. PENAL CODE ANN. § 12.425.

2022. When she arrived, Laake saw the motel owner outside, and he pointed to a room.[4] Laake entered the room and found Lewis, with whom Laake had had prior dealings, but no infant. Lewis "pointed to the bottom of the bed," where Laake found Jessica covered by a pink blanket. Jessica was "cold to the touch" and "was bluish around her eyes and mouth," and Laake "believe[d] her hands were blue." It was apparent to Laake that the baby was dead. Daniel Mathis, an emergency medical technician (EMT), arrived, as did the Daingerfield Chief of Police, Tracey Climer. Laake and Mathis both performed resuscitative procedures but ceased because postmortem lividity had set in.

## II.     The Trial Court Did Not Err in Denying Lewis's Motion to Suppress

In her first issue, Lewis complains that the trial court erred in denying her motion to suppress a box of marihuana and paraphernalia found in the motel room the morning of Jessica's death.

A recording from Laake's body camera (body cam) was admitted into evidence and played for the jury. On it, Laake and Climer were heard remarking about the strong smell of marihuana in the room. In the motel room, Climer found a wooden box with marihuana and drug paraphernalia. Lewis moved to suppress that evidence. She argued that exigent circumstances did not exist to justify law enforcement's warrantless entry into the room, which led to their discovery of that box and its contents. Once they found "the deceased infant," Lewis argued, they had no further right to seize and open the closed box.

---

[4]Also in the room were Lewis's two other children, nine-year-old Gloria, and two-year-old Chris. Also on site was adult Chase Bryant, who had watched the children the previous night while Lewis was at work. Bryant stayed in the room overnight.

## A. Standard of Review

We must affirm the trial court's ruling on a suppression issue "if it is correct on any theory of law that finds support in the record." *Carrillo v. State*, 235 S.W.3d 353, 356 (Tex. App.—Texarkana 2007, pet. ref'd) (citing *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002)). This is because we review "a trial court's ruling on a motion to suppress for an abuse of discretion." *State v. McGuire*, 689 S.W.3d 596, 601 (Tex. Crim. App. 2024).

We give "almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor while reviewing de novo other applications-of-law-to-fact issues." *Carrillo*, 235 S.W.3d at 355 (citing *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)). We also "afford nearly total deference to trial courts' rulings on application-of-law-to-fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We "review de novo mixed questions of law and fact not falling within this category." *Id.* at 355–56 (citing *Guzman*, 955 S.W.2d at 89).

## B. Analysis

"When a defendant moves to suppress evidence based on a warrantless search, the State has the burden of showing that probable cause existed at the time the search was made and that exigent circumstances requiring immediate entry made obtaining a warrant impracticable." *Turrubiate v. State*, 399 S.W.3d 147, 151 (Tex. Crim. App. 2013), *abrogated on other grounds by Igboji v. State*, 666 S.W.3d 607 (Tex. Crim. App. 2023).

4

"Probable cause to search exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found." *Estrada v. State*, 154 S.W.3d 604, 609 (Tex. Crim. App. 2005) (quoting *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991), *abrogated by on other grounds Igboji*, 666 S.W.3d 607). Upon arrival and entry into the motel room, two law enforcement officers and Mathis noticed a "stout" odor of marihuana. A partially smoked marihuana cigarette was in plain view on the dresser in the room. Officers were directed to a small baby that had blue coloring around her eyes and mouth. Jessica also "had postmortem lividity to the back of her neck and the side of her face." For those reasons, we find that "[t]his evidence, in addition to the smell of marihuana . . . is enough to establish that there was probable cause for [the officers] to believe that a crime had been or was being committed, and that evidence of that crime would be found." *Id.*

"[I]f probable cause is present, the inquiry becomes whether exigent circumstances existed to obviate the need for a search warrant and justify the initial warrantless entry . . . ." *Id.* at 608 n.12 (quoting *McNairy*, 835 S.W.2d at 107). "Exigent circumstances justifying a warrantless entry include 1) rendering aid or assistance to persons whom the officers reasonably believe are in need of assistance; 2) preventing destruction of evidence or contraband; and 3) protecting the officers from persons whom they reasonably believe to be present and armed and dangerous." *Id.*

Here, exigent circumstances justified law enforcement's presence in the motel room. Law enforcement responded to a report of an infant not breathing and attempted to render aid to

5

the infant.  *See Parker v. State*, 206 S.W.3d 593, 600 (Tex. Crim. App. 2006); *Estrada*, 154 S.W.3d at 610.  As a result, we conclude that the trial court did not abuse its discretion in finding that exigent circumstances were present.

Based on our review of the record, we conclude that the trial court properly denied Lewis's motion to suppress.  We, therefore, overrule Lewis's first point of error.

## III.    Lewis Waived Her Complaint about Introduction of an Order from a Suit Affecting the Parent-Child Relationship (SAPCR[5])

In a pretrial hearing, Lewis objected to the State's intention to offer a court order from a SAPCR regarding Gloria, Lewis's nine-year-old daughter, who was in the motel room when Jessica died.  Essentially, that order stated that Lewis was not to have unsupervised visitations with Gloria.[6]  The State sought to introduce the court order as evidence of Lewis's "mental state of criminal negligence," which was one of the charges on which Lewis was indicted.  When the State offered the exhibit at trial, the trial court asked if Lewis had any objection.  Through counsel, Lewis answered, "No, Judge."

A party "must . . . take care not to affirmatively indicate that [s]he has 'no objection' to the evidence that [s]he challenged in" a pretrial hearing "when it is later offered at trial." *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013).  The Texas Court of Criminal Appeals "has long held that such an affirmative statement constitutes a 'waiver' of the right to raise on appeal the error that was previously preserved." *Id.* at 881–82.

---

[5]*See* TEX. FAM. CODE ANN. § 102.0035(c).

[6]Visitations were to be supervised by Lewis's sister, Shyla Lewis.  The order from the SAPCR was entered in May 2015.  However, in a recorded interview with Gloria after Jessica's death, Gloria said that she had returned to living with her mother about three years prior.

6

> If the record as a whole plainly demonstrates that the defendant did not intend, nor did the trial court construe, h[er] "no objection" statement to constitute an abandonment of a claim of error that [s]he had earlier preserved for appeal, then the appellate court should not regard the claim as "waived," but should resolve it on the merits. On the other hand, if from the record as a whole the appellate court simply cannot tell whether an abandonment was intended or understood, then, consistent with prior case law, it should regard the "no objection" statement to be a waiver of the earlier-preserved error. Under the latter circumstances, the affirmative "no objection" statement will, by itself, serve as an unequivocal indication that a waiver was both intended and understood."

*Id.* at 885–86. "[T]he rule that a later statement of 'no objection' will forfeit earlier-preserved error is context-dependent." *Id.* at 885.

Here, there is no indication that Lewis intended to preserve the matter for appellate review when the evidence was offered at trial.[7] At the pretrial hearing, the State offered "any type of limited instruction" upon admission of the report, but Lewis did not avail herself of that offer. When it overruled Lewis's objection, the trial court stated that the report would be "entered in its entirety so that members of the jury [could] see and Ms. Lewis would be able to argue what she was [t]here very vehemently trying to argue before the Court."[8] Lewis's counsel answered, "Yes, your Honor." The trial court stated, "So that they can see all of the language." Lewis's counsel repeated, "Yes, your Honor." Lewis also never requested a running objection.

"[F]rom the record as a whole," including her lack of interest in some kind of limiting instruction, we "simply cannot tell whether an abandonment was intended or understood," so we

---

[7]A party may also preserve error by "object[ing] each time the inadmissible [or challenged] evidence is offered or obtain a running objection." *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003).

[8]Prior to the trial court's ruling, Lewis had an outburst covering almost four pages of the reporter's record, insisting that the SAPCR order was being misread by the parties. After warnings from the trial court, Lewis was removed from the courtroom, and the pretrial hearing continued in her absence.

treat Lewis's trial declaration of no objection as "a waiver of the earlier-preserved error." *Id.* This issue having been waived, we overrule Lewis's second point of error.

## IV.    Harmless Charge Error at Punishment

In her third point of error, Lewis complains that the trial court erred when it did not instruct the jury, at punishment, that it could only consider punishment evidence proved beyond a reasonable doubt. We agree.

### A.    Review of Charge Error

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32)).

Article 37.07, Section 3(a)(1) of the Texas Code of Criminal Procedure allows any evidence "relevant to sentencing," provided, *inter alia*, such "evidence of an extraneous crime or bad act" be proved "beyond a reasonable doubt." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Supp.). A trial court may not admit evidence of extraneous misconduct unless the evidence "is such that the sentencing entity (either judge or jury) can rationally find the defendant criminally responsible for the extraneous misconduct." *Smith v. State*, 227 S.W.3d 753, 759 (Tex. Crim. App. 2007). The court in *Smith* further stated,

> [O]nce the evidence is admitted, the sentencing entity must actually find (and if it is a jury, it must be *instructed* it must find) the defendant criminally responsible to

8

> a level of confidence beyond a reasonable doubt before considering the extraneous misconduct evidence against him in assessing his punishment within the legislatively prescribed range.

*Id.* at 760; *see also Delgado v. State*, 235 S.W.3d 244, 252 (Tex. Crim. App. 2007). "Thus, the trial judge must *sua sponte* instruct the jury at the punishment phase concerning that law, including the fact that the State must prove any extraneous offenses beyond a reasonable doubt." *Delgado*, 235 S.W.3d at 252.

Here, the trial court did not include such an instruction in the punishment charge. As a result, the trial court erred when it failed to include an instruction that extraneous offenses must be proved beyond a reasonable doubt in the punishment charge. *See id.*; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1). Having found error, we now review the record for harm.

### B. Harm Analysis

"The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Murrieta*, 578 S.W.3d at 555 (citing *Abdnor*, 871 S.W.2d at 732). When, as here, the defendant "did not object to the charge, we will not reverse [the judgment] unless the record shows the error resulted in egregious harm." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)).

"In making this determination, we review 'the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole.'"

9

*Id.* (quoting *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed)). "Direct evidence of harm is not required to establish egregious harm." *Id.* (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996), *overruled in part on other grounds by Gelinas v. State*, 398 S.W.3d 703 (Tex. Crim. App. 2013)). That said, "the record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error." *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005) (citing *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999)).

### 1. The Entire Charge

Other than the missing instruction, the charge at punishment is generally correct. It admonishes the jury not to consider Lewis's failure to testify and gave general instructions on parole law, with the explicit instruction "not to consider the extent to which good conduct time" may affect Lewis's particular sentence. The charge on guilt/innocence, "given just a day earlier, instructed the jury that the State's burden was beyond a reasonable doubt" for the charged offenses. *Loge v. State*, 550 S.W.3d 366, 384 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Because the "beyond a reasonable doubt" instruction regarding extraneous offenses was required in the punishment charge, the charge, as a whole, weighs slightly in favor of finding harm.

### 2. Evidence

Lewis accessed a room at the Relax Inn in Daingerfield with her three children and a male acquaintance.[9] When they woke the next morning, Jessica was unresponsive. Laake

---

[9]Lewis was unable to rent the room because she had no identification. From statements heard on Laake's body-cam recording, a man named Christopher Callendar apparently rented the room for Lewis. However, Bryant told officers that he had rented the room.

responded to a report of a "child not breathing" but saw no child upon entering. Lewis, known to Laake from previous interactions, "pointed to the bottom of the bed." Laake pulled back a blanket and found Jessica cold to the touch and with a blue color around her eyes and mouth. Jessica also had "postmortem lividity to the back of her neck area and the side of her face." Laake and Mathis attempted resuscitative measures to no avail.

Climer arrived and Laake sent Lewis outside to tend to her other children. Laake and Climer both smelled marihuana in the room, and a box of paraphernalia[10] was on one of the nightstands. A partially smoked marihuana cigarette was on the dresser. Also found in the room were items of clothing, baby formula, a baby's nasal aspirator, leftover pizza and boxes, cigarettes, including an ashtray with cigarette butts, and general items of personal care.

Laake spoke to Bryant, the twenty-seven-year-old male acquaintance who was in the room with Lewis and her children. He described the previous night's sleeping arrangements: he was on one side, Gloria and Chris in the middle, then Lewis and Jessica on the other side. Jessica was above the bed's covering in her own blanket. Bryant told Laake he was the first of the group to wake. When he picked up Jessica, he noticed she was not breathing and tried to perform CPR.

Mathis entered the motel room as Laake was starting CPR. Mathis observed that Jessica was already showing signs of lividity.[11] It was evident to Mathis that the child was already deceased, so they stopped lifesaving measures, and the justice of the peace was summoned.

---

[10]The box contained loose marihuana, a set of hemostats, a marihuana grinder, and rolling papers.

[11]Mathis explained lividity as "whenever . . . your heart stops pumping, which is what circulates your blood, the blood has to go somewhere. Gravity will pull that blood to a center spot really because it's no longer circulating."

Mathis described "a pretty chaotic scene," with "a bunch of trash everywhere" and a "pretty stout" "smell of marijuana." Mathis testified that he "still had the odor of marujuana [sic] on [his] clothes" when he got home. As for Jessica, her "diaper [wa]s full to the brim."

Grant Herndon, the medical examiner who supervised Jessica's autopsy, described her cause of death "as a result of [an] undetermined cause in the setting of an unsafe sleep environment." The autopsy did not show if she died from suffocation, i.e., the "prevention of oxygen getting to the bloodstream so that the organs can remain oxygenated." Herndon explained a "safe sleep environment" as "a firm mattress meant for an infant in a bassinet or crib with nothing else but the infant in it." An unsafe sleep environment presents the danger of "asphyxia or smothering." Had someone rolled over on Jessica, causing "overlay," that would not have been revealed by the autopsy.

Dr. Kristin Reeder, a pediatrician specializing in child abuse, testified that five people sleeping in the same bed would not be a safe sleep environment for children. If the adults in such a situation also admitted to smoking marihuana, that too would be unsafe. Placing a child in such an environment, Reeder testified, would be negligent, exposing the child to "death, bodily injury, physical or mental impairment." Reeder had reviewed the autopsy report and noted that traces of methamphetamine were found in Jessica's blood.

Kyle Henson, an investigator with the Texas Department of Family and Protective Services (CPS), interviewed Lewis the day after the events at the motel. Lewis told him that she had worked until 10:00 p.m., went to the motel room, "[g]ot the kids ready for bed," "smoked mari[h]uana," and "[p]ut them in bed with her." Lewis told Henson that there was nothing

12

wrong with the children the night before Jessica died. She said she woke about 3:00 a.m., fed Jessica, and went back to sleep. When she woke later that morning, "she realize[d] that [Jessica] was cold and lifeless." Lewis told Henson that "she wasn't sure if [Jessica] may have choked on a bottle or if she had rolled over on top of" her. According to Lewis, Bryant had been sleeping on the floor. Lewis told Henson that she smoked marihuana daily and took a Xanax the day prior to checking into the motel, as well as the marihuana she smoked before bed.

At that point in Henson's testimony, the State introduced, without objection, the order from the SAPCR requiring any visits with Gloria be supervised. Henson believed that that order was in place on April 7, 2022, the morning Jessica died. Henson read for the jury the following provision from the order: "VISITATION BETWEEN CASSANDRA LEWIS AND [GLORIA] WILL BE SUPERVISED AND AT THE DISCRETION OF SHYLA LEWIS."[12] The order was entered May 28, 2015. Lewis told Henson that Jessica had never been seen by a doctor and had been born at home.

At the punishment stage, the evidence presented to the jury without a reasonable doubt instruction consisted of the following: (1) testimony about Lewis's other children, (2) a traffic stop and citation given to Lewis for not properly restraining a small child, and (3) leaving a child in the care of an intoxicated driver. All of the witnesses that testified about those matters were subject to cross-examination.

---

[12]The quoted language was contained in Appendix A of the order from the SAPCR. On cross-examination, Lewis had Henson read a paragraph from the main body of the SAPCR order: "IT IS ORDERED that the conservators shall have possession of the child at times mutually agreed to in advance by the parties and, in the absence of mutual agreement, as specified in Attachment A to this order." At no point did Lewis offer any evidence that she and Shyla had agreed to Lewis's possession of Gloria on April 6 or 7, 2022.

The State provided judgments proving two prior state jail felonies.[13] In February 2016, Lewis was sentenced to six months' confinement in state jail for forgery. *See* TEX. PENAL CODE ANN. § 32.21. In October 2017, she was sentenced to eighteen months' confinement in state jail for possession of methamphetamine. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115. In both cases, Lewis originally received suspended sentences, had her community supervision revoked, and was sentenced to state jail.

Henson testified at punishment that Gloria was born with marihuana in her system. At the time of Gloria's birth, Lewis also tested positive for marihuana. Chris was also born with marihuana in his system. CPS initiated an investigation after Jessica's death, and methamphetamine was then found in both her system and Chris's system. CPS's investigations on Lewis's four oldest children found "validated allegations of neglect and abuse" by Lewis. Three of her children were removed, and Lewis failed to complete a court-ordered drug test. No court orders or documents were offered to prove those allegations.

Officer Jonathan Jordan with the DPD testified that he conducted a traffic stop around 3:00 one morning in 2001 and that Lewis was cited for failing to have her infant, Chris, properly secured in a child safety seat. Laake testified that, in January 2022, she investigated an intoxicated driver who had hit several vehicles with his truck in a parking lot. While Chris remained in the truck with the intoxicated driver, Lewis went into the store. Laake's body-cam footage of that event was played for the jury and admitted into evidence. On the recording, Lewis can be seen taking charge of the vehicle, with Chris inside, after the driver was arrested.

---

[13]The proof of the judgments is discussed in our review of the next point of error, below.

14

The state of the evidence weighs against a finding of harm.

### 3. Argument

Neither party mentioned proof beyond a reasonable doubt in their closing argument. The State told the jurors to find the enhancement allegations true if they believed the testimony of fingerprint expert, Ross Dickson, who testified that the judgment on State's Exhibit 31 bore a thumbprint that matched Lewis's. Lewis pointed out that State's Exhibit 30 bore a thumbprint that was "illegible and that that conviction [wa]s actually for a Ms. Edwards." In rebuttal, the State reminded the jury that Billy Mack Harrison, a retired investigator for the Morris County District Attorney's Office, testified that he was in the courtroom when Lewis was convicted as evidenced by Exhibit 30. Harrison also testified that he was "familiar" with Lewis, and in the State's closing argument, it stated that there was "[n]o doubt [that was] her in this judgment."

The argument of the parties weighs neither for nor against a finding of harm.

### 4. Other Factors

During voir dire, the State told the venire panel that the State bore the burden of proving "every element of the offense beyond a reasonable doubt." The jury ultimately acquitted Lewis of criminally negligent homicide. That suggests the jury was aware of and considered the legal requirements at the guilt stage.

Based on our review of the record, we believe Lewis has failed to show that she suffered egregious harm from the trial court's failure to include the required jury instruction. As a result, we overrule Lewis's third point of error.

15

## V.       Sufficient Proof of Prior Conviction

Finally, Lewis complains that the State did not sufficiently prove one of the prior convictions used to enhance her range of punishment. The State offered Exhibit 30, a Morris County judgment for forgery entered under cause number 10,863CR on February 24, 2016, to prove its first enhancement allegation. That judgment is styled *The State of Texas v. Cassandra Lewis Edwards*. Though there is a thumbprint on the judgment, the State did not ask its fingerprint expert to compare that thumbprint when he testified.

"Just as there is more than one way to skin a cat, there is more than one way to prove a prior conviction." *Flowers v. State*, 220 S.W.3d 919, 922 (Tex. Crim. App. 2007). "To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction." *Id.* at 921.

To prove the prior conviction introduced as Exhibit 30, Harrison testified that he had been in the courtroom in February 2016 when Lewis was convicted in cause number 10,863CR in Morris County. Lewis was not in the courtroom for Harrison's testimony in the instant proceeding.[14] The State asked Harrison if he was "familiar with the defendant in this matter, Cassandra Lewis," and he answered affirmatively.

Although Exhibit 30's style refers to the defendant as "Cassandra Lewis Edwards," it is signed by "Cassandra Lewis." Further, Dickson testified that the thumbprint on Exhibit 31, an

---

[14]Lewis chose not to attend the trial that day. Previously, she had chosen to be absent from court when the State presented recorded evidence of the circumstances around the discovery of Jessica's lifeless body by law enforcement. She had also been removed from a pretrial hearing by the trial court because of repeated outbursts.

Upshur County judgment convicting "Cassandra Denise Lewis" of possession of less than one gram of methamphetamine, matched the thumbprint taken from Lewis at her "most recent arrest in Morris County." Finally, both Exhibits 30 and 31, as well as the judgment for the instant offense of abandoning or endangering a child, bear the State's Identification Number TX08848926. That evidence was enough for the jury, looking at the totality of the evidence, to find a previous conviction and that Lewis was the person convicted, beyond a reasonable doubt. *See id.* at 923.

As a result, we overrule Lewis's fourth point of error.

## VI. Modification of Judgment

This Court has the power to modify the judgment of the court below to make the record speak the truth if the matter has been called to the Court's attention by any source and if this Court has the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992). Upon reviewing the record, we noticed that the trial court's judgment states that the statute of the offense is Section 22.014 of the Texas Penal Code, which is incorrect. The offense of abandoning or endangering a child is codified at Section 22.041. Accordingly, we modify the judgment to state the correct offense of conviction, Section 22.041 of the Texas Penal Code.

17

## VII.    Conclusion

As modified, we affirm the trial court's judgment.


Scott E. Stevens
Chief Justice


Date Submitted:    December 12, 2024
Date Decided:    April 17, 2025

Do Not Publish